**SANDOZ PHARMACEUTICALS CORP., Plaintiff,**

v.

**RICHARDSON–VICKS, INC., Defendant.**

Civ. A. No. 89–422–JJF.

United States District Court, D. Delaware.

Sept. 22, 1989.

John W. Nields, Jr. (argued), and Kathleen H. McGuan, of Howrey & Simon, Washington, D.C., Thomas Herlihy, III, of Herlihy Harker & Kavanaugh, Wilmington, Del., for plaintiff.

Harold P. Weinberger (argued), Jonathan M. Wagner, and Samuel Friedman, of Kramer Levin Nessen Kamin & Frankel, New York City, Jack B. Blumenfeld, of Morris Nichols Arsht & Tunnell, Wilmington, Del., for defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Plaintiff, Sandoz Pharmaceuticals Corporation ("Sandoz") and Defendant, Richardson–Vicks ("Vicks") are competitors in the children's cough medicine market. Sandoz brought this action against Vicks for unfair advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This opinion addresses the motion for a preliminary injunction which Sandoz filed simultaneously with its complaint on August 14, 1989 and constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) following the completed briefing of this motion and an evidentiary hearing held on September 14, 1989.

## FACTUAL BACKGROUND

Plaintiff Sandoz is a Delaware corporation with its principal place of business in East Hanover, New Jersey, and is engaged in the business of developing and manufacturing various pharmaceutical drugs and other products which are sold throughout the United States. Sandoz manufactures and markets the cough products TRIAMINIC–DM and TRIAMINICOL.

Defendant Vicks entered the children's cough remedies market on a test basis in 1987 with its new cough-cold product for children, Pediatric Formula 44 ("Pediatric 44"). Vicks intends to market Pediatric 44 on a nationwide basis this fall. To that end, it has developed an advertising campaign involving the television and print media predicated on Vicks' claim that Pediatric 44 "starts to work the instant they [children] swallow" by "shielding irritated cough receptors on contact." Vicks' advertisements consist of television commercials (D.I. 16B, Exhibit 23), print advertisements in consumer magazines, and coupons that all advance the advertising claim. Vicks also provides "information sheets" to pediatricians that, in addition to stating that Pediatric 44 results in fewer coughs, claim that it "starts to work the instant they [children] swallow" and "provides significantly better cough relief in the first thirty minutes". The sheets also depict a bar graph illustrating the results of "Study 87–55" (D.I. 16B, Exhibit 26), which compares Pediatric 44 with the "leading OTC cough syrup" and shows Pediatric 44 apparently outperforming the competition.

The active cough suppressant ingredient in both Sandoz's and Vicks' cough medicines is dextromethorphan hydrobromide ("dextromethorphan"). Dextromethorphan is an antitussive that acts on the central nervous system approximately twenty to thirty minutes after it is ingested. The dextromethorphan in TRIAMINIC is delivered in a syrup containing several inactive ingredients, including Red 40, propylene glycol, purified water, sorbitol and sucrose, while in Pediatric 44 dextromethorphan is delivered in a syrup including celluse, carboxymethylcellulose, sodium, potassium sorbate, Red 40, propylene glycol, glycerine, purified water, sorbitol, and sucrose.

The basis of Vicks' "starts to work instantly" claim and the crux of this dispute is the topical effect of the inert syrup in Pediatric 44. Vicks contends the syrup which is especially viscous or thick acts as a "demulcent" on cough receptors in the membranes lining the throat and respiratory passages by coating irritated mucus membranes. The sucrose and propylene glycol in the syrup are some of the demulcents that allegedly cause this effect. In support of Vicks' claim, its expert, Dr. Boushey, opined that the demulcent could

work to coat the nerve endings in the throat as soon as it is swallowed (Boushey Deposition p. 20). However, demulcents have not been approved by the FDA as an antitussive medicine effective for the relief of coughs. *See* 21 C.F.R. § 341.14 (giving list of antitussive active ingredients). On the other hand, Vicks asserts the syrup does not require FDA approval.

In support of the advertising claims, Vicks relies on four (4) clinical tests known as citric acid aerosol induced cough tests ("CAA") performed on the Pediatric 44 product by Dr. Elias Packman. The test used healthy subjects who were induced to cough artificially by inhalation of a citric acid aerosol. A baseline was established for the subject on the first day of the test by having the subject inhale the aerosol, cough, rest for 20–30 seconds, and inhale again. This cycle was repeated five times. After the baseline was established, the subject was given a bottle of the treatment being tested: either an experimental drug, a competitive product, or an aqueous solution. At five, fifteen, and thirty minute intervals after the test material was ingested, the CAA spray was repeated and the coughs were counted. According to Dr. Packman, any reductions in the cough count from the baseline to the post treatment was attributable to the effects of the treatment drug.

The tests are known as "crossover studies". A subject receives one of the tested substances on one day, then another substance three to seven days later. The tests are also single blinded in that the investigator is unaware of which product is being used by a subject. They are not double blinded since the preparations tested are not concealed from the subjects. In the first test, Study 82–11, the demulcent action of three substances (Cremacoat vehicle, sucrose solution, aqueous solution) was tested in ninety (90) subjects. Vicks asserts that the results indicate that the substance with the Cremacoat (a Pediatric 44 forerunner) demonstrated greater reduction in the count of the coughs.

The second test, Study 87–12, used thirty subjects and five treatments (Robitussen DM, Robitussen Cough Preparation without menthol, Robitussen Cough Preparation with menthol, Pediatric 44 vehicle without menthol, and Pediatric 44 vehicle with menthol). The active cough preparations produced better results than the vehicles. Vicks asserts that the Pediatric 44 vehicle yielded favorable results regarding the fast protection that it offered. In a third test, Study 87–35, which used thirty subjects and compared Pediatric 44, an aqueous solution, and Robitussen DM, Vicks asserts that Pediatric 44 performed significantly better than the others. Study 87–51 used twenty-eight subjects and compared Pediatric 44 10 ml., 15 ml., Robitussen DM at 5 ml., and an aqueous solution. Relying upon the results of these tests, Vicks points to a reduction in coughs for the Pediatric 44 treatments. A final test, Study 87–19, compared Pediatric 44 in 15 ml. and 10 ml. doses, Pediatric 44 without dextromethorphan in 15 ml. and 10 ml., and a 10 ml. Robitussen DM treatment. Robitussen outperformed the Pediatric 44 in Study 87–19 at five and fifteen minute intervals.

Sandoz has numerous criticisms of these tests. Sandoz primarily claims that the studies are inappropriate for testing the effectiveness of non centrally acting antitussives. Sandoz also asserts that the studies were not done on children with coughs but on "experienced," paid coughers. Additionally, Sandoz makes a series of other charges: that CAA studies alone cannot establish the claimed antitussive effect of a drug, that the test subjects were not adequately blinded and could discern what was received, that inadequate placebos or controls were used rendering the tests of little value, and that only one investigator was used and that the results were not clinically sufficient. Vicks defends the CAA test and answers that a CAA test is more appropriate than a disease state test because a disease population lacks homogeneity and makes it difficult to find an appropriate number of subjects to test. They also assert that subjects could not remember a treatment three to seven days after they receive it.

Sandoz asserts that the advertising claims made by Vicks based on these tests are false and misleading. Sandoz seeks an order either prohibiting Vicks from making the claims that the syrup works instantly based on the properties of the demulcents; or forcing Vicks to disclose that the demulcents are not approved as effective by the FDA and to list the demulcents as active ingredients on the label. Additionally, Sandoz seeks an order barring Vicks from advertising its instant relief claims based on the alleged properties of the demulcents and from claiming that Pediatric 44 is unique or superior in any way to the competitive brands.

Vicks responds that Sandoz is not entitled to relief because the advertising claims are either true or have not been proven false by Sandoz.

### DISCUSSION

*Preliminary Injunction Standard*

■ To obtain preliminary injunctive relief in this Circuit, the moving party must make a showing of the following four factors:

1. Reasonable probability of success on the merits.
2. Irreparable injury to the moving party.
3. Possibility of harm to other interested parties.
4. The public interest.

*Eli Lilly & Co., v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3rd Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

A. *Probability of success on the Lanham Act claims.*

■ Section 43(a) of the Lanham Act provides that:

Any person who shall ... use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable in a civil action by any person ... who believes that he is or is

likely to be damaged by the use of such false description or representation.

15 U.S.C. § 1125(a). To prevail on a claim of unfair competition under Section 43(a), a plaintiff must first prove by a preponderance of the evidence that the claims it challenges are false or misleading.

■ When the challenged claims are literally false, the court may grant relief without consideration of the impression that the advertising may have created on the buying public. *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir.1982). A determination of whether or not the claims are literally false entails an analysis of the message conveyed by the advertising in context. *See Plough, Inc. v. Johnson & Johnson Baby Products Co.,* 532 F.Supp. 714, 717 (D.Del. 1982).

■ If the challenged claim is literally true, to prove that it is therefore deceptive or misleading (i.e., consumers would find that the message conveyed left a false impression about the product), plaintiff must prove the following: 1) that the statement is material because it is likely to influence purchasing decisions and 2) that the misrepresentation has a tendency to deceive the consumer. *See Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1222 (D.Del.1986); *Toro Co. v. Textron Inc.,* 499 F.Supp. 241, 251 (D.Del.1980). With these principles as a guide, I turn to an analysis of the challenged claims.

■ Vicks' claim in its advertisements and materials that Pediatric 44 "starts to work the instant they [children] swallow shielding irritated cough receptors on contact" (D.I. 16B, Exhibit 23) depends for its truthfulness on Vicks' assertions regarding the effects of Pediatric 44's demulcents and the thickness of its inert syrup.

The evidence adduced by both parties relevant to the assertions by Vicks consists of conflicting expert opinion and the four clinical tests conducted by Vicks, the results and methodology of which, while attacked by Sandoz, indicate that the demulcent in Pediatric 44 could begin to work upon swallowing. The Court is not persuaded that Vicks' claim is literally false,

particularly since most parents know that most any fluid will begin to soothe a throat "the instant they [children] swallow". The inquiry thus focuses upon whether or not the advertisement is misleading and leaves consumers with a false impression about the Vicks product.

The record is devoid of any evidence from which I could find that consumers would find that the advertising will leave a false impression about the product. Sandoz has produced no market research or consumer studies indicating that consumers will be misled or left with a false impression from the advertisement. *See Coca–Cola Co. v. Tropicana Products Inc.*, 690 F.2d 312, 317 (2d Cir.1982) (when challenged advertisement is "implicitly ... false its tendency to violate the Lanham Act by misleading ... should be tested by public reaction").

Further, it is the Court's view that the advertising statement would probably not influence the purchasing decision. Parents buy what their pediatrician or their own experience tells them is most effective. As noted, Vicks' claim "starts to work when swallowed" could indicate precisely what it claims, that the ingredients in Pediatric 44 as a whole begin acting to relieve a cough as soon as the child takes it. While the advertisement may imply that the medicine works more quickly than it does, the record is devoid of any proof of exactly what the consumers believe. The Court is not persuaded that the evidence here demonstrates that a consumer would take the claim "starts to work the instant they [children] swallow" as a statement that the cough stops right away, even though a consumer may believe from the claim that something happens to lessen the symptoms when the syrup is swallowed. In *Upjohn v. Riahom*, the court found that Riahom's claims that the RIVIXIL was a cosmetic and had been clinically tested had a tendency to deceive the consumer. 641 F.Supp. at 1223. However, in that case, Riahom had never even tested the material and thus had no basis to claim that it was a cosmetic or that it was safe. *Id.* In the instant case, Vicks has tested the product in support of its claims so they are not deceptive

on that basis. While the claim may deceive the consumer about what actually works in the product, this has not been established by Sandoz.

With regard to the bar graph of Study 87–55 in the "information sheets", the Court concludes it is not literally false. There is no evidence that the targeted audience, pediatricians, are misled or deceived by the graph. For these reasons, the Court concludes that Sandoz has failed to establish the requisite probability of success on the merits of its Lanham Act claim.

B. *Irreparable Injury.*

■■■ Proof of irreparable harm entails proof of a reasonable basis for the belief that Sandoz is likely to be damaged as a result of the Vicks' advertising. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980); *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. at 1224. Likelihood of injury is shown by proof that the parties are competitors in the market. *Carter–Wallace*, 631 F.2d at 190. Additionally, a causal link between defendant's advertisements and plaintiff's sales position must be demonstrated. *See Coca–Cola Co. v. Tropicana Products Inc.*, 690 F.2d 312, 317 (2d Cir.1982).

If consumers are misled by the advertisement and Sandoz loses customers to Vicks, irreparable harm could be established. There is no evidence in the record, however, to support the conclusion that customers are likely to be lost. Although no proof of actual sales diversion is required, *Johnson & Johnson v. Carter–Wallace Inc.*, 631 F.2d at 191, no causal link in the form of any market or consumer study has been demonstrated between Vicks' advertisements and the sales position of Sandoz. In *Carter–Wallace*, the court noted that Johnson & Johnson showed the causal link with specific evidence of a decline in sales, consumer witnesses, and consumer surveys. 631 F.2d at 191. The case involved a baby oil producer and a depilatory manufacturer that claimed its product contained baby oil. *Id.* at 188. The plaintiff there showed that large numbers of consumers use baby oil to shave and after shaving or

applying a depilatory cream, so that the defendant's claims affected both markets. *Id.* at 191. The record in this case is devoid of any such evidence. Moreover, Vicks has introduced uncontroverted evidence that in the Pittsburgh, Pennsylvania test market following a similar commercial for Pediatric 44, the sales of Sandoz's TRIAMINIC products increased about 27% (*See* Barnett Deposition at p. 42). The Court cannot find on this record that Sandoz will suffer irreparable harm.

Since Sandoz has failed to meet its burden on two of the four criteria required for issuance of a preliminary injunction, its application must be denied.

An appropriate order will be entered.