**THE GILLETTE COMPANY, Plaintiff**

v.

**NORELCO CONSUMER PRODUCTS COMPANY, a Division of Philips Electronics North America Corporation, Defendant.**

No. CIV. A. 96–12034–RCL.

United States District Court,
D. Massachusetts.

Oct. 6, 1999.

George J. Skelly, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Kenneth A. Plevan, Bruce J. Goldner, Stephanie J. Kamerow, Skadden, Arps, Slate, Meagher & Flom, Esther S. Trakinski, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Gillette Company, Plaintiffs.

Robert S. Frank, Jr., Choate, Hall & Stewart, Boston, MA, Robert J. Giuffra, Jr., John C. Stellabotte, Alan S. Rabinowitz, Sullivan & Cromwell, New York, NY, Raymond A O'Brien, Choate, Hall & Stewart, Boston, MA, Michael H. Steinberg, Sullivan & Cromwell, Los Angeles, CA, for Norelco Consumer Products Company, A Division of Philips Electronics North America Corporation, Defendants.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

### I. Introduction

This case raises the question of whether one of two competitors in the shaving products industry has falsely or misleadingly touted its own product to the disadvantage of the products of the other competitor. Thus does the plaintiff, The Gillette Company ("Gillette"), allege that certain television commercials of the defendant, Norelco Consumer Products Company ("Norelco"), violate section 43(a) of the Lanham Act ("Section 43(a)"). The commercials in question feature a wet razor (i.e., a manual razor that includes blades) depicted in animated form and state that Norelco's Reflex Action razor ("Reflex Action"), an electric razor, produces "less irritation than blades." Gillette asserts that the claim in the commercials that the Reflex Action produces "less irritation" is false or misleading.

Gillette has requested that the court enter an order permanently enjoining Norelco from (1) airing the commercials at issue; (2) publishing any advertising that claims that the Reflex Action shaves with less irritation than (a) Gillette's Sensor and SensorExcel (two Gillette wet razors), (b) any so-called "systems razor" (i.e., razors with disposable blades, but reusable handles), or (c) any blade razor; (3) publishing any advertising that claims that electric razors shave with less irritation than blades based on a definition of "irritation" that includes "nicks and cuts" as an attribute of irritation; and (4) using the so-called PACE Study (addressing the efficacy of the Reflex Action compared to wet razors) for any advertising or promotional purpose. Gillette has not sought damages. Both Gillette and Norelco, however, have requested attorneys' fees.

### II. Procedural Background

Gillette filed this action in October 1996 and shortly thereafter requested a preliminary injunction prohibiting Norelco from continuing to use certain advertisements for the Reflex Action during the pendency of this litigation. In November 1996, the court entered a preliminary injunction enjoining Norelco "from making any statement or claim, in any advertisement or promotion, to the effect that the Reflex Action shaver ... shaves with less irritation than wet shavers, without also including a ... statement to the effect that a user of the Reflex Action" must use the razor for a twenty-one day acclimation period before he will experience decreased irritation. *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F.Supp. 115, 140 (D.Mass.1996) ("*Gillette I*"). The court further enjoined Norelco from making any claims based on a limited consumer reaction survey known as the Celebrity Study. *See id.* at 141. That Study and the advertisements based on it were not issues in the trial of this case.

During the period between the granting of preliminary relief and the commencement of trial the court has ruled on various motions, thereby narrowing the issues for trial. The most important of these rulings

are briefly recounted here. On August 11, 1997, the court, in a ruling from the bench, granted Norelco's motion for summary judgment as to Gillette's Lanham Act claims based on the product inserts Norelco includes with the packages that contain the Reflex Action sold at retail. The court, however, denied the motion to the extent that it asserted that Norelco was entitled to summary judgment as to Gillette's claim that Norelco's commercials were misleading based on their use of certain images and on the so-called tag line, "Anything Closer Could Be Too Close For Comfort." *See Gillette Co. v. Norelco Consumer Prods. Corp.*, No. 96–12034 (D.Mass. Aug. 11, 1997) (Docket No. 98). In September 1998, the court, in a ruling from the bench, granted Norelco's motion for summary judgment based on the mootness of Gillette's claims arising from Norelco's "clinically proven" advertisements. In that ruling the court also granted summary judgment as to Gillette's sole claim under Massachusetts law. *See Gillette Co. v. Norelco Consumer Prods. Corp.*, No. 96–12034 (D.Mass. Sept. 8, 1998) (Docket No. 228). In October 1998, the court denied Norelco's motion for summary judgment, made on the ground that Gillette had suffered no injury. *See Gillette Co. v. Norelco Consumer Prods. Corp.*, No. 96–12034 (D.Mass. Oct. 9, 1998) (Docket No. 240). On the same day, the court granted Norelco's motion for summary judgment with respect to Gillette's claim that Norelco's print advertisements and its so-called "Razor Bites" television commercial violated the Lanham Act. *See Gillette Co. v. Norelco Consumer Prods. Corp.*, No. 96–12034, slip. op. at 5 (D.Mass. Oct. 9, 1998) ("*Gillette II* "). The court further granted Norelco's motion for summary judgment as to all of the commercials to the extent that Gillette claimed that the commercials were literally false. *See id.* at 6. Thus, at the time this action went to trial, Gillette's claim for injunctive relief was based solely on four television commercials denominated as follows: "Fire Breathing Razor," "Twin Blade Serpent," "Possessed Razor," and "Razor Smiles and Frowns." Gil-

lette's claims as to these four commercials were limited by the court's ruling of October 9, 1998 that the commercials were not literally false; accordingly, the burden on Gillette at trial was to prove the implied falsity of the four commercials. *See id.*

As to these four commercials, a non-jury trial took place over twenty-one days. The court now makes the following findings of fact and states the following conclusions of law.

## III. Findings of Background Facts

### A. The Parties, the Products, and the Commercials

Gillette, a Delaware corporation with its principal executive offices in Boston, Massachusetts, manufactures and markets wet-shaving products. Norelco, a division of Philips Electronics North America Corporation, has its principal executive offices in Stamford, Connecticut and sells a line of electric razors under the brand name "Norelco."

Generally, the world of male shaving products is divided into wet and dry (electric) shaving. In the United States, approximately seventy percent of male shavers use wet or blade razors, and approximately thirty percent use electric razors. Wet-shaving products are of two basic kinds: disposable razors and systems or refillable razors. Disposable razors are plastic razors that are disposed of in their entirety after use. Systems or refillable razors are more permanent because only the used blades, as opposed to the entire razor, are discarded. Gillette is the leading manufacturer and marketer of wet-shaving shaving products in the United States: its share of the wet-razor market is approximately fifty percent on a unit basis.

In 1996, when the commercials at issue in this case were first aired, Gillette's premier wet-shaving razor products were its Sensor and SensorExcel razors. Both are systems razors. Together they accounted for about fifteen percent of the wet-razor

market on a unit basis. After the Norelco Reflex Action advertising campaign had ended, these razors accounted for about twenty percent of the wet-razor market.

In 1996, Norelco began marketing the Reflex Action in the United States. The four commercials at issue in this case were part of Norelco's marketing strategy for the Reflex Action and were aired on national television.

The commercial known as "Fire Breathing Razor" features a silver, animated wet razor with black dots on the handle and along the sides of the blades. The animated razor appears on the viewing screen while a voice-over states: "It has a lubricated comfort strip, and for a lot of guys, that's not much comfort." The razor then breathes fire that fills the screen. The visual image then changes to the Reflex Action, and the voice-over states: "Introducing the Norelco Reflex Action Razor, a great shave with less irritation than blades." The words "Norelco. Anything Closer Could Be Too Close For Comfort" (known as the "tag line") then appear on the screen with the Reflex Action. Following the court's ruling in *Gillette I*, the commercials also include a qualifier, stating, "After a 21 day adjustment period," which appears on the screen at the end of the commercial.

The commercial called "The Possessed Razor" features what appears to be the same animated wet razor as in the "Fire Breathing Razor" commercial. This time, however, the razor corrodes and twists its "neck and head," apparently in an effort to evoke recollection of a scene from the motion picture *The Exorcist.* At the same time, the voice-over states: "A blade can leave you feeling irritated. What would possess it to do that?" Then, the Reflex Action is shown with the voice-over stating: "Introducing the Norelco Reflex Action Razor. A great shave, with less irritation than blades." Again, the commercial ends with an image of the Reflex Action accompanied by the visual tag line and qualifier.

The third commercial, "Twin Blade Serpent," features the animated razor and a voice-over stating: "Every morning, millions of twin-blade razors raise their ugly heads." The animated razor then displays a forked, snake-like tongue, flicking from between its blades. Then, as the Reflex Action is shown, the voice-over states: "But now, there's the Norelco Reflex Action Razor. A great shave with less irritation than blades." Again, the visual features the Reflex Action, the tag line, and the qualifier.

The final commercial, "Razor Smiles and Frowns," also features the animated wet razor. This time, the voice-over states: "Does it have a lubricating comfort strip?" The animated razor then smiles and nods. The voice-over goes on to ask: "Does it need a lubricating comfort strip?" The animated razor then frowns and nods. The visual then switches to the Reflex Action, and the voice-over states: "Introducing the Norelco Reflex Action Razor. A great shave with less irritation than blades." The final image is again the Reflex Action with the tag line and qualifier.

### B. Consumer Understanding of the Commercials

As this court has held previously, the meaning of the commercials at issue is ambiguous. *See Gillette I,* 946 F.Supp. at 123; *Gillette II,* at 6. The commercials refer to "blades" and "less irritation," but it is not clear on the face of the commercials to what universe of wet razors they refer; nor is it clear what the term "irritation" means in context. Thus, to succeed on its Lanham Act claim, Gillette must show what meaning consumers take away from these commercials. *See, e.g., Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297–98 (2d Cir.1992). To this end, Gillette presented several consumer studies at trial.

### 1. The Razor Commercial Study

The animated razor depicted in the commercial does not bear a brand name. Fur-

thermore, none of the commercials specifically mentions a particular brand or type of wet razor. Therefore, before the court can determine whether the commercials are false or misleading in stating that the Reflex Action produces "less irritation than blades," Gillette must establish the brand or kind of wet razor to which the Reflex Action is being compared.

For this purpose, Gillette offered the so-called Razor Commercial Study. Sharon Keith, Gillette's Vice President of Marketing Research for Grooming Products Worldwide designed this Study. The Razor Commercial Study consisted of a one-cell test[1] conducted in four locations.[2] One hundred males between the ages of eighteen and fifty-four, who had shaved in the preceding seven days, were shown the "Fire Breathing Razor" commercial. Seventy percent of these respondents had used a blade razor for their last shave, and thirty percent had used an electric razor. After viewing the commercial twice, the respondents were shown a display of twelve wet razors. Six of these display razors were systems razors, and six were disposable razors. The six systems razors were: Gillette's SensorExcel, Gillette's Sensor, Gillette's Trac II Plus, Gillette's Atra Plus, and the Tracer and Tracer FX models manufactured and sold by Shick. The six disposable razors featured in the display were: Gillette's Custom Plus, Gillette's Good News, Schick's Slim Twin Regular, and three products manufactured by Bic— the Original, the Sensitive, and the Twin Sensitive.

After viewing the commercial and while being shown the razor display, the respondents were asked to choose the wet razor,

if any, that looked most like the animated wet razor in the Reflex Action commercial. Gillette presented the following results of responses to that question: 38% of the respondents identified Gillette's SensorExcel; 20% identified Gillette's Sensor; 16% identified Gillette's Atra Plus; 4% identified Gillette's Trac II Plus; 3% identified Gillette's Custom Plus; and none identified Gillette's Good News. Eight percent of the respondents identified Schick's Tracer, and another eight percent identified Schick's Tracer FX. Two percent identified Schick's Slim Twin Regular, and none of the respondents identified any of the Bic razors. One percent of the respondents responded that none of the display razors looked most like the animated razor in the commercial. Based on these results, Gillette contends that consumers interpret the Norelco commercials as comparing the Reflex Action to Gillette's Sensor and SensorExcel and to all systems razors.

### 2. The Jacoby Study

In addition to the Razor Commercial Study, Gillette offered what generally was referred to at trial as the Jacoby Study on the issue of the meaning of "blades" in the commercials.[3] Dr. Jacob Jacoby[4] prepared this study at the request of Gillette's counsel shortly after the commercials at issue first aired. The stated objective of the Jacoby Study was to determine whether consumers perceived the Norelco advertising to be "misleading and/or disparaging of non-electric bladed razors."

The Jacoby Study involved 456 respondents, all of whom were age eighteen or over and regularly shaved with a wet razor

1. A one-cell test means that all groups of respondents were shown the same commercial and asked the same questions.

2. The description of the Razor Commercial Study provided here is based on the description provided in the Final Report prepared by Data Development Corporation ("DDC"), the firm that actually administered the study. At trial, Gillette did not present witnesses who actually participated in or observed the execution of this study.

3. As discussed later in this memorandum, the Jacoby Study also relates to the question of what the commercials mean by use of the term "irritation."

4. Dr. Jacoby testified at trial as an expert for Gillette. He is the Merchants Council Professor of Consumer Behavior and Retail Management at the Leonard N. Stern School of Business, New York University and is principal of Jacob Jacoby Research, Inc.

at least three times per week. The respondents were divided into three groups or cells, one of which was exposed to a Norelco print advertisement, one of which was exposed to a control print advertisement, and one of which was exposed to the Norelco "Fire Breathing Razor" television commercial.[5] The 156 respondents in the third group were shown the television commercial twice, and then were asked: "Other than trying to sell you a product, what was the main idea of this ad?" and "What other ideas was the ad trying to get across?" The most common responses offered to these questions were: 26% said that the Norelco razor would not "burn/ feel (like fire)," while the razor with a blade would; 20% said that the "[e]lectric razor is better (than blade razor)/[e]lectric razor shaves better;" 16% said that the Norelco razor "is comfortable to shave with/(Razor with a) blade is not as comfortable to shave with;" 15% said that the Norelco razor would not "irritate as much," and that the razor with a blade would irritate more; 15% said that the

Norelco razor was comfortable to shave with, and that the razor with a blade was not; 12% said that the Norelco razor would not irritate, while the razor with a blade would; 10% said that "[y]ou get a close shave with a Norelco (electric) razor;" and 37% of the respondents were classified as answering "other."[6]

The respondents next were asked: "Though you may have already told me this, what product was being advertised in the commercial?" All of the respondents who viewed the television commercial stated that the product was an electric razor. Next, the respondents were asked: "Was the advertised product being compared to any other kind of razor?" That question was followed up with questions designed to determine whether the respondents understood that the electric razor was being compared to a blade razor. Seventy-seven percent of the respondents who viewed the commercial indicated that the advertised product was being compared to a blade razor. At this point, all respondents who did not state that the advertised product

---

5. As noted above, the print advertisements are no longer at issue in this litigation. Thus, the only portion of the Jacoby Study that has any bearing on the issues now presented is that part of the Study that focused on the Norelco television commercial. Dr. Jacoby testified that he relied on the print control advertisement as a control for the television commercial as well. The print control advertisement, however, was designed to test the impact of the visual images. The court, at this point, is concerned not just with the impact of the visual images, but with the impact of the commercial as a whole. In addition, as Dr. Jacoby himself acknowledged at trial, there are problems with using a print control advertisement to test a television commercial. He acknowledged, for example, that print advertisements have different executional elements from television commercials and that print is a static medium that a viewer can study as long as he or she wants, whereas television commercials are dynamic, passing generally within a few seconds.

6. Each of the remaining answers recorded constituted less than ten percent of the respondents: 7% said that a shaver would get "a closer shave" with the Norelco razor; 6% said that a person would get a "smoother shave" with the Norelco razor; 5% said that the Norelco razor would not "cut/scratch/

scrape/nick/tear/rip," while the razor with a blade would; 5% said that a shaver would get a "good shave" with the Norelco razor; 5% said that a shaver would get a "smooth shave" with the Norelco razor; 3% said that the Norelco razor would not "burn as much/ feel (like fire)," while the razor with a blade would; 3% said that the Norelco razor was "gentler to shave with," while the razor with a blade was "not gentle/rough to shave with;" 3% said that the Norelco razor "follows the contours of your face;" 3% said that they did not know; 2% said that the Norelco razor would not "hurt/damage," while the razor with a blade would; 2% said that the razor with a blade "shaves too close;" 1% said that the Norelco razor would not sting, while the razor with a blade would; 1% said that the Norelco razor would not sting as much, while the razor with a blade would sting more; 1% said that the Norelco razor would not "hurt/damage as much," while the razor with a blade would "hurt/damage" more; 1% said that the Norelco razor would give a "cool shave," while the razor with a blade would give a "hot shave;" 1% said that a shaver would get a "better shave" with the Norelco razor; and 1% said that the "[e]lectric razor shaves as close as a blade."

was an electric razor and that it was being compared to a blade razor were excused.

The seventy-seven percent of respondents who had stated that the electric razor was being compared to a blade razor then were asked the following question, designed to determine whether they thought that the commercial was comparing the electric razor to a particular brand of blade razor: "To which, if any, brand or brands of razors with blades was the advertised product being compared?" [7] Twenty-eight percent of all the respondents said that they did not know to what brand of blade razor the advertised product was being compared. Nineteen percent stated that the comparison was to Gillette; 18% stated that the comparison was to no brand of blade razor; 8% were recorded as answering "other;" 5% stated that the comparison was to Schick; 2% said that the comparison was to Bic; 1% stated Personna; and 1% stated Wilkinson.

The Jacoby Study then went on to ask whether the commercial said or "suggest[ed] anything about how your face would feel during or after shaving with a razor with a blade?" The sixty-two percent of the respondents who answered affirmatively then were asked: "What did the ad say or suggest about how your face would feel during or after shaving with a razor with a blade?" Thirty-five percent responded that the Norelco razor would not "burn/feel (like fire)," while the razor with a blade would "burn/feel (like fire) your face/skin." Twelve percent responded that the Norelco razor would not "irritate," while the razor with a blade would irritate your face or skin.[8]

Respondents were asked: "When the ad shows a flame coming out from between the blades, what do you think this picture means or suggests?" [9] Fifty-three percent of the respondents who viewed the television commercial stated that the Norelco razor would not "burn/feel (like fire)," while the razor with a blade would "burn/feel (like fire) your face/skin." Nineteen percent responded that the Norelco razor would not "irritate" while the razor with a blade would "irritate (your face/skin)." [10]

7. The 23% of the respondents who had not thought that the commercial was comparing the electric razor to a blade razor were not asked this question or any of the following questions.

8. Each of the other responses constituted less than 10% of the respondents: 6% said that the Norelco razor is "comfortable to shave with," while the razor with a blade is not; 6% said that a shaver would get a "cool shave" with the Norelco razor and a "hot shave" with a razor with a blade; 6% are classified as responding "other;" 4% said that the Norelco razor would not "irritate as much," while the razor with a blade would irritate the face/skin more; 4% said that the Norelco razor would not "cut/scratch/scrape/nick/tear/rip," while the razor with a blade would; 3% said that the Norelco razor is "more comfortable to shave with," while the razor with a blade is not as comfortable; 2% said that the Norelco razor is "gentle to shave with," while the razor with a blade "is not gentle/rough to shave with;" 2% said that a shaver gets a "smoother shave" with the Norelco razor; 1% said that the Norelco razor would not "burn as much/feel (like fire)," while the razor with a blade would "burn/feel more (like fire) your face/skin;" 1% said that the Norelco razor would not "sting," while the razor with a blade would; 1% said that the Norelco razor "is more gentle to shave with," while the razor with a blade "is not gentle/rougher to shave with;" 1% said that a shaver gets a "good shave" with the Norelco razor; 1% said that a shaver gets a "better shave" with the Norelco razor; 1% said that a shaver gets a "close shave" with the Norelco razor; 1% said that a shaver gets a "closer shave" with the Norelco razor; 1% said that a shaver gets a "smooth shave" with the Norelco razor; and 1% said that they did not know.

9. Prior to this question, the respondents were asked to rate the level of irritation that the commercial suggests could be expected from shaving with the advertised electric razor and with the razor with a blade. The responses to this question, however, are presented in such a way that they are very dependent on the control print advertisement and really address the impact of the visual aspect of the commercial apart from the impact of the commercial as a whole. Thus, they are not relevant to the issues at hand.

10. Each of the remaining responses accounted for less than 10% of the respondents: 8%

The respondents then were asked questions about the Norelco tag line, "Anything Closer Could Be Too Close For Comfort." First, the respondents were asked: "As you can see, the last line of the ad says: 'Anything closer could be too close for comfort.' What if anything does this mean?" Thirty-three percent of those who viewed the television commercial stated that "[i]f you get closer it will tear/cut your skin." Eleven percent of the responses were classified as "other," and 10% answered "don't know/no answer." [11] Next, the respondents were asked which, if either, of two provided meanings they extracted from the tag line. Thirty-eight percent of the respondents thought that the tag line meant that "if you could get a closer shave with a razor with a blade, it probably wouldn't be a comfortable shave." Seventeen percent thought that the tag line was "just an advertising slogan to describe the advertised product; it is not meant to compare the shave you would get with the advertised electric razor to the shave you would get with a razor with a blade." Seventeen percent of the respondents thought that both meanings were correct.[12]

From the results of the Jacoby Study, Gillette contends that consumers interpret the Norelco commercials as making a comparison between the Reflex Action and all marketed blade razors.

### 3. Other Evidence on the Meaning of "Irritation"

In addition to the Jacoby Study, there was other evidence presented by the parties at trial on the issue of the meaning of the term "irritation." Much of that evidence centered around whether the term "irritation" included nicks and cuts.

In 1996, in support of its motion for a preliminary injunction in this case, Gillette submitted the sworn Affirmation of Thomas Gallerani, Vice President of the Shaving Technology Laboratory for Gillette's North Atlantic Group. Mr. Gallerani had "supervisory responsibility" for the testing of wet-shaving products at Gillette. In his affirmation, Mr. Gallerani described testing performed at Gillette for the purpose of refuting Norelco's "less irritation" claim. In that regard, Mr. Gallerani stated: "Gillette's test results establish that Norelco's claim of (i) less irritation, and (ii) clinical proof showing less irritation, for the Reflex Action Razor are false. In our 'split-face' study, the attributes *'freedom from nicks and cuts,'* 'caution,' and 'comfort after shaving' *all address the issue of 'irritation.'* " (Emphasis added.)

were recorded as responding "other;" 5% stated that the Norelco razor would not "hurt/damage," while the razor with a blade would "hurt/damage your face/skin;" 5% stated that the Norelco razor is "comfortable to shave with," while the razor with a blade "is not comfortable to shave with;" 3% stated that a shaver gets a "cool shave" with the Norelco razor and a "hot shave" with the razor with a blade; 3% stated that they did not know; 2% stated that the Norelco razor would not "cut/scratch/scrape/nick/tear/rip," while the razor with a blade would; 2% stated that the Norelco razor "is gentle to shave with," while the razor with a blade "is not gentle/rough to shave with;" 1% stated that the Norelco razor would not "burn as much/feel (like fire)," while the razor with a blade would "burn/feel more (like fire) your face/skin;" 1% stated that the Norelco razor would not "sting," while the razor with a blade "will sting (your face/skin);" 1% stated that the Norelco razor would not "irritate as much,"

while the razor with a blade would "irritate (your face/skin) more."

11. Each of the remaining responses constituted less than 10% of the responses: 6% stated, "This is as close as you can get;" 6% stated, "if you get closer, it would irritate;" 4% stated, "You could be burned/if you get closer, it will burn;" 4% stated, "If you get closer, it would be uncomfortable;" 3% stated, "Norelco gives a close shave;" 1% stated, "It's as comfortable as you can get;" 1% stated, "If you get closer it will hurt;" 1% stated, "A blade causes burn;" 1% stated, "Norelco gives a smooth shave;" 1% stated, "Norelco gives you the best shave;" 1% stated, "Norelco shaves closer than a blade;" and 1% stated, "none/nothing."

12. Another 2% stated that neither meaning was correct; 1% stated that some other meaning was correct; and 2% stated that they did not know or had no opinion.

Criticizing Norelco's testing of the Reflex Action, Mr. Gallerani went on to state:

Additionally, disposable razors generally, and in particular those with a single blade, are known to be far more likely to cause facial irritation, nicks and cuts than the independently spring mounted twin blade, pivoting head technology used in Gillette Sensor and SensorExcel systems (for which nicks and cuts is not a significant issue). The inclusion of disposable razors in the study therefore would have given results skewed in Norelco's favor in terms of *nicks and cuts and other indicia of irritation.*

(Emphasis added.) Thus, at the time Gillette sought from this court a preliminary injunction prohibiting Norelco's use of the commercials now at issue and other advertising promoting the Reflex Action, Gillette took the position that "nicks and cuts" were consumer-perceived manifestations of irritation.

At trial, however, Gillette disavowed that position. Gillette's trial position was that consumers *do not* perceive nicks and cuts to be one of the "indicia of irritation." Gillette's witness, Dr. Charles Slife, President of Gillette Research Institute ("GRI"), for example, testified that "nicks and cuts are not a description of irritation." Its witness, Kathleen Grealish, Gillette's Vice President of Marketing Research, testified that nicks and cuts are different from irritation. Gillette's witness, Dr. Richard Cohen, Manager of Shaving Research at GRI, testified at trial that, although nicks and cuts are related to irritation, in that they are factors in a consumer's overall evaluation of his shave, nicks and cuts are not a direct measure of irritation.

As bases for the assertions by its trial witnesses, Gillette offered evidence in the form of studies commissioned by Gillette and Norelco and certain internal advertising documents of Norelco. For its part, Norelco responded to Gillette's evidence with Gillette studies of consumer perceptions, which show, according to Norelco, that consumers believe nicks and cuts to be attributes of irritation. In the main, however, Norelco aimed its fire at Gillette's credibility on the nicks-and-cuts question, arguing that Gillette's trial position on the question represents a recent and convenient conversion from a well-established view that consumers understand nicks and cuts to be a reflection of irritation.

Gillette presented a study that it commissioned in 1998 called "Consumer Description of Irritation From Blade Shaving" (the "Dupont Study"). Dr. Thomas Dupont, a survey research expert and President of the firm D$^2$ Research conducted the Dupont Study. The stated objective of the Dupont Study was "to determine, quantitatively, how actual users of razor blade products describe shaving irritation, and specifically whether or not the term 'irritation' includes nicks and cuts." The Study was prompted, according to its introduction, by what the Study says are contradictory results in Norelco's research on the question of whether the consumer believes nicks and cuts are attributes of irritation.

Dr. Dupont conducted a telephone survey among "a national probability sample of 501 men age eighteen and over who shave at least three times a week and usually shave with a blade razor." Respondents were asked whether they "ever experience irritation from shaving with a blade." Those who responded "yes" then were asked: "In as much detail as you can, please describe that irritation to me." This question was followed with a single probe question: "Is there anything you care to add? What?" The interview then was ended. Those who responded that they did not experience irritation or that they did not know were asked: "Do you ever get nicks or cuts from shaving with a blade?" The interview then was ended.

Dr. Dupont reported that 26.1% of the respondents stated that they did experience irritation, while 73.3% stated that they did not.[13] The 26.1% who stated that

---

13. 0.6% of the respondents stated that they did not know whether they experienced irrita-     tion from blade shaving.

they did experience irritation then were asked to describe it. Of those who responded to this question, 35.9% (or 9.4% of all respondents) described irritation as "Burning/razor burn;" 35.1% (or 9.2% of all respondents) described irritation as "Skin gets red/rash;" 8.4% (or 2.2% of all respondents) described irritation as "Bumps;" 8.4% (or 2.2% of all respondents) described irritation as "Nicks/cuts;" 7.6% (or 2.0% of all respondents) described it as "Irritation (no further information);" 5.3% (or 1.4% of all respondents) responded "Itching;" another 4.6% (or 1.2% of all respondents) responded "Dry skin;" 3.8% (or 1.0% of all respondents) responded "Tenderness/soreness;" 1.5% (or 0.4% of all respondents) responded "Scrapes;" and 6.9% (or 1.8% of all respondents) gave some other response.

The 73.9% of the respondents who stated that they did not experience irritation were asked whether they ever get nicks and cuts from shaving with a blade. Of those respondents, 43.1% said that they did experience nicks and cuts; 30.3% stated that they did not; and 0.2% said that they did not know. Dr. Dupont concluded from these findings that a minority of blade shavers experience irritation; that among those who say they do experience irritation, relatively few consider it to include nicks and cuts; and that among those who say they do not experience irritation, 58.4% do experience nicks and cuts. He concluded that "consumers regard 'irritation' and 'nicks and cuts' as separate concepts."

In further support of its trial assertion that nicks and cuts are not perceived by consumers as an aspect of irritation, Gillette also offered a focus group study performed for Norelco in 1995 by Callé and Company ("Callé"). The purpose of the Callé Study was to determine how Norelco could " 'get' manual users" and how it could " 'keep' them." Callé reported that "more newsworthy and more important to a significant blade-converting target of

men is that Norelco can shave close with less irritation" and recommended that this news would "convert an important and significant number of men from manual to electric shaving." [14]

Gillette points to the following statement contained in the Callé Study:

Irritation looks bad, feels bad, and shavers feel it says bad things about them; that they are awkward, inexperienced, ignorant shavers. An irritated neck is said to make you feel less competent. It differs from nicks and cuts which are larger abrasions.

Visually, it is: a red, bumpy, blotchy glow and rashlike appearance. It is also big, red, ugly bumps, or "big red crabs" on the neck. One man wanted "to stop looking like a redneck."

It feels like; an itch, a rash, like a floor burns, sandpaper, a bad sunburn, a fire, a hot, stinging, red, glowing, sizzling pain that lasts for a few hours or all day. It burns especially in the summer when the salt of perspiration hits the "open wound."

Gillette asserts that this excerpt shows that the Callé Study finds that consumers treat nicks and cuts as a separate condition from irritation.

Gillette also points to internal documents of Norelco as reflecting Norelco's view that consumers treat irritation and nicks and cuts as separate phenomena. For example, Gillette points to a draft of the "copy strategy" of Norelco's advertising campaign, which describes a "consumer insight" as "the biggest problem I have with shaving is that I can irritate my skin and sometimes I get nicks and cuts." That document, in another place, states that the "creative target audience" for Norelco's advertising campaign for the Reflex Action "is a blade user who experiences occasional to frequent nicks, cuts and irritation when shaving." Gillette also calls attention to a 1996 Norelco "building

---

14. The Callé Study reported a variety of consumer perceptions and recommended a variety of means for marketing the Reflex Action.

This portion of this memorandum focuses on the aspects of the Callé Study that go to the meaning of "irritation."

brief," written in the early stages of Norelco's advertising campaign for the Reflex Action, which states, "43% of blade shavers have problems with irritation. 52% with nicks and cuts." Finally, Gillette points to promotional material for the Reflex Action in which Norelco makes statements like "once that swelling goes down, you are left with the reality of a blade shave 'not as close as you thought,' plus nicks, cuts, and irritation thrown in for good measure;" "[a]s a blade user you are no stranger to nicks, cuts and irritation of shaving;" "[b]ut if after 21 days you miss the nicks, cuts, and irritation of a blade we'll give you your money back." The separation of irritation from nicks and cuts by a conjunction (or in one case by a period), in these several examples, Gillette argues, shows that Norelco adheres to the distinction between nicks and cuts, on one hand, and irritation on the other.

Norelco, for its part, draws attention to certain of Gillette's pre-Reflex Action research on the question of consumer definition of irritation. In 1989, GRI conducted the "Male Wet Shaving Survey On Post–Shave Irritation." In that survey, a questionnaire was sent to male respondents, some of whom were employees of Gillette or one of its affiliates. Twenty-nine employees and ninety-two non-employees returned completed questionnaires. Eighty-eight of the respondents used blade razors. Thirty-six of these blade shavers (or forty-one percent) responded that they suffered from "post-shave irritation." These thirty-six respondents were asked additional questions about the irritation they experienced. When asked to "[d]escribe the irritation," the blade shavers responded in the following manner: Thiry-six percent responded "Neck turns red," "Redness of neck," and "Red patches," and were classified by GRI as falling into the "Redness" category. Thirty-three percent described the irritation as "Shaving bumps," "Like pimples," "Red hive-type spots," "Red rash," "Red bumps on neck," and "Rash"

and were classified by GRI as falling into the "Bumps" category. Thirty-one percent described the irritation as "Burning sensation," "Burning," "Stinging sensation," "Hot," and "Razor burns" and were categorized as "Burning." Seventeen percent described the irritation as "Soreness," "Neck is raw," "Skin feels raw," "Face feels raw," and "Tenderness," and were categorized as "Soreness." Seventeen percent described the irritation as "Nicks, Small cuts," "Bleeding," "Bloody" and were categorized as "Nicks." [15]

The questionnaire also asked all of the blade shavers, "Do you experience any of the following conditions as a result of shaving?" The questionnaire then listed redness, soreness, dryness, itchiness, and nicking and instructed respondents to add any conditions that were not listed. Those respondents who had stated that they did not experience irritation responded in the following manner: 37% reported nicking; 12% reported dryness; 6% reported redness; and 1% reported itchiness. Those respondents who had stated that they did experience irritation responded in the following manner: 89% reported redness; 61% reported nicking; 61% reported soreness; 36% reported itchiness; 28% reported dryness; 6% reported burns; and 2% reported bloody.

Norelco points to a similar GRI study conducted in 1991. In this study, the approximately sixty-seven men who said they experienced shaving irritation reported in the following manner: 32% described "rash/bumps;" 27% described "burning;" 24% described "redness;" 17% described "itching;" 14% described "tender;" 6% described "nicks;" 5% described "dry;" 3% described "stinging;" 2% described "tingly;" 2% described "soreness;" 2% described "ingrown hairs." When asked whether they suffered from certain identified conditions, those respondents who had stated that they suffered from irritation gave the

---

**15.** Smaller percentages described the irritation with other terms and were not categorized by GRI: 11% described the irritation as

"Sharp drying sensation;" 6% described it as "Itchiness;" 3% described it as "Irritation;" and 3% described it as "Blotches."

following responses: 70% reported bumps; 62% reported redness; 46% reported soreness; 44% reported nicking; 31% reported itching; and 19% reported dryness.[16] Those respondents who had stated that they did not experience shaving irritation responded in the following manner: 3% reported bumps; 27% reported redness; 1% reported soreness; 19% reported nicking; 15% reported itching; and 3% reported dryness.[17]

Norelco asserts that these Gillette surveys support its argument that consumers perceive nicks and cuts to be an aspect of irritation, presumably because of those who reported experiencing irritation in the 1989 survey, 61% responded "nicking," and 44% of those who reported that they experience irritation in the 1990 survey reported experiencing "nicking." Gillette, on the other hand, argues that the specific questions, the responses to which Norelco points for support of its contention, merely asked respondents "to describe common conditions associated with shaving." The question to which the responses were made, Gillette argues, did not ask respondents to describe irritation.

Norelco also calls attention to another Gillette study to support Norelco's contention that nicks and cuts are a consumer-perceived indication of irritation. In 1995, GRI conducted the "Male Adolescent Shaving Study," which was designed to test the efficacy of the SensorExcel, Bic, and BumpFighter razors with respect to adolescent males with mild to moderate acne. The questionnaire used in that Study included a section captioned "Postshave Irritation," which asked respondents to check all of the following terms that apply: Redness, Soreness, Stinging, Burning, Dryness, Itching, Nicking, Bleeding, Red Bumps, White Bumps, Red Rash, Red Blotches, and Other. The Study also asked respondents to complete an "adolescent shave study rating sheet." The rating sheet, among other things, asked re-

spondents to rate "during shave comfort," which was defined as "the comprehensive rating of overall satisfaction during the shave including the sensation of razor glide, pull, scrape, stinging/burning, and irritation." The rating sheet also asked respondents to rate "during shave pull," "post shave closeness," "post shave tenderness," "post shave redness," "post shave stinging/burning," and "overall shave quality." Finally, the rating sheet also asked the respondents to rate "post shave irritation," which was defined as "the comprehensive rating of irritation/discomfort felt after the shave including the sensations of stinging/burning, nicks/cuts, soreness/tenderness, flushing/ redness, dryness/tightness, and skin feel." Norelco contends that Gillette's inclusion of "nicks and cuts" in the definition of "post shave irritation" demonstrates that Gillette's pre-trial understanding was that nicks and cuts are an indication of irritation.

Finally, Norelco notes that Gillette's internal skin irritation complaint logs group complaints about nicks and cuts with complaints about irritation from shaving.

### IV. Ultimate Findings of Fact and Conclusions of Law

■ Before the court may issue a permanent injunction, it must find that (1) Gillette has prevailed on the merits; (2) Gillette will suffer irreparable injury if injunctive relief is not granted; (3) Gillette's harm, in the absence of an injunction, would outweigh Norelco's harm if an injunction were granted; and (4) "the public interest would not be adversely affected by an injunction." *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 5 (1st Cir.1997). The first requirement, prevailing on the merits of its Lanham Act claim, means that Gillette must prove:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2)

---

**16.** These percentages are approximate as only a bar graph was available in the exhibits used at trial.

**17.** Again, the percentages are approximate.

the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997); *see also United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir.1998); *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 129 (3d Cir.1994). Gillette must prove its Lanham Act claim by a preponderance of the evidence. *See Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 735 F.Supp. 597, 600 (D.Del.1989), *aff'd,* 902 F.2d 222 (3d Cir.1990); *Toro Co. v. Textron, Inc.,* 499 F.Supp. 241, 251 (D.Del. 1980).

■ As noted above, the court has already held that the Norelco Reflex Action commercials at issue are ambiguous because (1) the commercials do not define the universe of wet razors to which the Reflex Action is compared, and (2) it is not clear what the term "irritation" means in context. Gillette therefore must make out a claim of implied falsity in order to prevail. *See Gillette II,* at 6–7. A claim of implied falsity requires that the court make a two-part determination. First, the court must determine what the ambiguous statements made in the commercials mean to consumers. This inquiry has been described by the Second Circuit in the following manner:

> Where ... a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers. It is not for the judge to determine, based solely upon his or her own intuitive reaction, wheth-

er the advertisement is deceptive. Rather ..., "[t]he question in such cases is—what does the person to whom the advertisement is addressed find to be the message?" That is, what does the public perceive the message to be?

*Smithkline Beecham Corp.,* 960 F.2d at 297–98 (citations omitted) (quoting *American Home Prods. Corp. v. Johnson & Johnson,* 577 F.2d 160, 166 (2d Cir.1978)); *see also William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir.1995); *Mead Johnson & Co. v. Abbott Lab.,* 41 F.Supp.2d 879, 882 (S.D.Ind.1999). This first determination will turn on the persuasiveness of Gillette's consumer studies and surveys. *See Smithkline Beecham,* 960 F.2d at 298; *Church & Dwight Co. v. S.C. Johnson & Son, Inc.,* 873 F.Supp. 893, 906 (D.N.J.1994); *Coors Brewing Co. v. Anheuser–Busch Companies,* 802 F.Supp. 965, 970 (S.D.N.Y.1992). If Gillette succeeds in establishing what the Reflex Action commercials mean to consumers, the court must consider the second inquiry—whether that meaning is deceptive or misleading. *See Smithkline Beecham,* 960 F.2d at 298.

### A. Meaning of "Blades"

■ As explained above, one of the ambiguities of the Reflex Action commercials lies in their use of the term "blades," when they say that the Reflex Action is "less irritating than blades." The commercials do not explicitly refer to any specific brand or type of blade razor. Thus, to succeed on its Lanham Act claim, Gillette must demonstrate by a preponderance of the evidence what blade razors are being compared to the Reflex Action. *See, e.g., id.* at 297–98; *Sandoz,* 735 F.Supp. at 600.

The court finds that Gillette has failed to establish the universe of blade razors to which, in the minds of consumers, the Reflex Action is compared in the commercials. Gillette's own view regarding the understanding consumers have of "blades," as that term is used in the commercials, is itself unsettled. Gillette has asserted in

this proceeding that there are at least three different universes of blade razors to which the Reflex Action is compared in the commercials. First, Gillette contends that its Razor Commercial Study shows that consumers view the commercials as comparing the Reflex Action to Gillette's Sensor and SensorExcel. *Gillette's Proposed Findings* ¶ 57. Second, Gillette asserts that this same Study also demonstrates that consumers view the commercials as comparing the Reflex Action to all systems razors. *Id.* Third, Gillette asserts, in discussing the Jacoby Study, that the comparison is between the Reflex Action and "all marketed blade razors." *Id.* ¶ 38. With regard to this last contention, Gillette argues that the comparison "was a broad one, addressed in effect to the bladed razor then being used by each male wet shaver to whom the advertising campaign ... was targeted." *Id.* ¶ 41. The fact that Gillette itself seems to have difficulty in assessing what its consumer surveys have to say about the comparison made in the commercials is itself sufficient ground for the finding that Gillette's studies do not establish the meaning of the comparison. But there are other grounds as well.

Gillette asserts that the Razor Commercial Study supports its contention that consumers understand that the "blades" to which the commercials compare the Reflex Action are specifically the Sensor and SensorExcel (viewed as one category of blade razor) and all systems razors as well. That Gillette posits that the Razor Commercial Study indicates a consumer perception that the commercials make a comparison between the Reflex Action and two different categories of blade razors undermines the reliability of the Study as a report of consumer understanding.

But there are other problems with the Razor Commercial Study. Taken together, and with Gillette's contention that the Study shows perception of two separate Reflex Action/blade comparisons, these problems are fatal to the probative value of the Study.

To establish the reliability of a survey, a party must show the following:

(1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the entire process was assured.

*Consumers Union of United States, Inc. v. New Regina Corp.*, 664 F.Supp. 753, 768 n. 19 (S.D.N.Y.1987); *see also Smithkline Beecham*, 960 F.2d at 300.

The Razor Commercial Study falls well short of meeting these standards of reliability. First, the Study employed a markedly suggestive question: "Which, if any, of these wet razors looks most like the wet razor shown in the commercial you just saw?" (asked of respondents while they viewed a display of twelve blade razors). The use of leading questions, especially in the absence of initial non-leading questions, has often led courts to find consumer reaction studies unreliable. *See, e.g., Smithkline Beecham*, 960 F.2d at 300–01; *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms. Co.*, 27 U.S.P.Q.2d 1029, 1993 WL 21239, *10–11 (E.D.Pa. Jan.29, 1993), *aff'd*, 19 F.3d 125 (3d Cir.1994); *Coors Brewing Co.*, 802 F.Supp. at 972–73. Indeed, Gillette's expert, Dr. Jacoby, was unable to summon up a single advertising take-away study (a study assessing the message consumers "take away" from a commercial or advertisement) that he had performed in which he had failed to include open-ended (i.e., non-leading) questions. Moreover, after explaining that, while manufacturers and service companies differ in their use of open-ended versus aided questions in their non-litigation market research, Dr. Jacoby

noted in a published article that "aided questions have often been criticized in deceptive advertising actions" and that "unaided questions have been praised because they do not force an unnatural degree of attention on a test stimulus." Jacob Jacoby, et al., *Survey Evidence in Deceptive Advertising Cases Under the Lanham Act: An Historical Review of Comments From the Bench,* 84 The Trademark Reporter 541, 561 (1994). Another Gillette expert, Dr. Dupont, agreed that, when conducting an advertising take-away study, one should ask a directed question only when it is not possible to ask a non-leading, open-ended question.

Although the Razor Commercial Study survey question included the words "if any," it clearly planted the idea in respondents' minds that the animated razor in the commercial looked like one of the actual, marketed wet razors shown to them. The question inevitably led the respondents to attempt to find from the wet razors offered one that most resembled the animated razor in the commercial. That a particular respondent chose a razor from the display in answer to the leading question, however, does not tell us whether the respondent believed his chosen razor so closely resembled the animated razor that he would have associated the two without prompting with the display. The fact is that the Razor Commercial Study simply does not replicate the environment in which the commercials are likely to be viewed. It is unlikely in the extreme that the typical viewer of the commercials would see the commercials at a time when he or she had available an array of blade razors for comparison.

Gillette responds to this criticism by saying that the Study replicates the typical environment in which the consumer purchases shaving products, namely the retail store where many brands of razors are displayed. This response is not persuasive. The Razor Commercial Study was designed to have the respondent answer the "looks-most-like" question as the respondent viewed the commercial. While an array of razors will be present in the retail store, the commercial, on the other hand, typically will be absent. To truly report consumer understanding at the time of purchase, the Razor Commercial Study would have had to test the respondents' capacity to remember, over some appropriate period of time, the details of the animated razor (seen for a few seconds in the Fire Breathing Razor Commercial) and to make a comparison in the absence of the commercial. The Razor Commercial Study included no such test.

Gillette asserts that the leading question employed in the Razor Commercial Study was actually a follow-up to the open-ended questions used in the Jacoby Study. That is, Gillette argues that the Razor Commercial Study's survey question follows up the Jacoby Study questions which inquire whether the commercials made a comparison and, if so, to what. The court rejects this contention. Although the evidence at trial established that directed questions are appropriate as follow-ups to open-ended questions, common sense (which the court, as factfinder, may apply) dictates that the follow-up should take place within the same survey and among the same respondents to whom the open-ended questions were asked. The Razor Commercial Study was performed years after the Jacoby Study and with completely different respondents, who were never asked the open-ended Jacoby Study questions, but only the closed-ended Razor Commercial Study question. Gillette has offered no evidence to show that it is appropriate, as a research technique, to follow up a non-leading question asked of one group of respondents in one study with a leading question asked of another group of respondents in a later study.

If the Razor Commercial Study had first employed open-ended questions to determine whether consumers thought that the commercial was making a comparison to a specific universe of actual blade razors, it might have been appropriate then to ask the respondents, who thought such a comparison was being made, a leading ques-

tion designed to elicit what the respondents thought was being compared to the Reflex Action. The Razor Commercial Study, however, failed first to filter out those respondents who did not view the commercial as comparing the Reflex Action to a specific universe of actual, marketed blade razors. The fact that the Jacoby Study may have done so is irrelevant to an understanding of the responses given by the completely different Razor Commercial Study respondents at a later time.

The Razor Commercial Study also is deficient in its failure to determine in context the meaning of any comparison made in the commercial. When a consumer study proposes to determine what consumers perceive a commercial to mean, it is important that the study take into consideration the entire context of the commercial. *See, e.g., U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 922 (3d Cir. 1990). The Razor Commercial Study focused respondents solely on the animated razor in the commercial, rather than on any comparison that the commercial made as a whole. A respondent who thought that the animated razor looked like one of the razors in the display, when specifically asked, might not have perceived the commercial as a whole to make a comparison between the Reflex Action and a specific blade razor. The Study asked only what displayed blade razor looked most like the animated razor. It did not ask respondents the essential question: whether the commercial itself was making a comparison between the Reflex Action and some other product.

Another flaw in the Razor Commercial Study is that the universe of consumers surveyed was improperly limited in that it excluded important segments of the universe of prospective purchasers of the Reflex Action. The respondents in the Razor Commercial Study were male shavers between the ages of eighteen and fifty-four. Gillette asserts that the respondents reflect the "target audience of the commercials and as such [were] a proper universe for the study." [18] Not included in the study, however, were males under eighteen and over fifty-four and all females. The trial evidence, however, demonstrates that adolescents and older men are more likely than other men to select an electric razor. Such persons are thus potential purchasers of the Reflex Action. Moreover, the uncontradicted evidence is that more than half of the electric razors that Norelco sells in the United States are sold as gifts and that women are often the purchasers of such gifts. Women too then are potential purchasers of the Reflect Action.

These exclusions compromise the usefulness of the Razor Commercial Study. According to Gillette's own expert, Dr. Jacoby, a proper study of the meaning an advertisement conveys to consumers is a study that includes past and/or prospective purchasers:

> At the outset, careful attention must be devoted to defining the universe(s). Generally, this will consist of past and/or prospective purchasers of the product or service. In most instances, the universe will be the "ultimate consumers" (i.e., the people who pay for and use the product/service). In some instances, the relevant universe will consist of intermediaries .... The key question to answer is: who is it that decides what is to be

---

**18.** In one paper outlining strategies for Norelco's promotional campaign for the Reflex Action, Norelco describes the "creative target audience" for the campaign as a male blade user, age twenty-five or older, "who experiences occasional to frequent nicks, cuts and irritation when shaving." In another such paper, Norelco describes the "program target as men over twenty-one who shave with a blade razor." Norelco argues, however, that its advertising campaign for the Reflex Action was not targeted solely at blade users. Norelco notes that one of the papers, on which Gillette relies for its understanding of the Reflex Action's target audience, warns that the campaign should not be so structured as to exclude users of electric razors. Notwithstanding this protest by Norelco, the court finds that Gillette correctly has defined the target audience for the Reflex Action commercials.

purchased? If the decision maker is someone other than the ultimate consumer ..., it may be the former's state of mind that is of greatest relevance. Jacob Jacoby, et al., at 572; *see also Abbott Lab. v. Gerber Prods. Co.,* 979 F.Supp. 569, 574 (W.D.Mich.1997) ("[C]ourts approve of the use of actual and potential users in consumer reaction surveys."); *Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y. 1981) ("To be probative and meaningful ... surveys ... must rely upon responses by potential consumers of the products in question."). With respect to the use of the "target audience" as the appropriate survey universe, Dr. Jacoby wrote: "[I]t should be recognized that the 'target universe' defined by an advertiser for the purpose of its advertising campaign is usually not one and the same as the universe of past and/or prospective purchasers." Jacoby, et al., at 572.

The court finds that the reliance by the Razor Commercial Study on the "target audience" of the commercials as the survey universe is a significant error in methodology.[19] But beyond that, it appears that the survey universe of the Razor Commercial Study is not in fact the target audience described in Norelco's strategy papers. That audience consisted solely of male blade users. The survey universe for the Razor Commercial Study, however, included both men who were blade users and men who used electric razors. Indeed thirty percent of that universe was constituted of men who had used an electric razor for their last shave. To be sure, users of electric razors are likely actual or potential purchasers of the Reflex Action, but they were not included in the target audience for the Reflex Action advertising campaign. Thus, to the extent that Gillette justifies the survey universe of the Razor Commercial Study on the basis that that universe is the one targeted by the commercials, Gillette is in error even in the identification of the target audience; and that error is yet another problem with the Razor Commercial Study.

For all of the reasons discussed above, the court finds that the Razor Commercial Study is not reliable. Looked at in the best possible light, the Razor Commercial Study shows nothing more than that a high percentage of respondents thought that the animated razor in the Fire–Breathing Razor commercial looked most like a Gillette razor than other razors included in the display. Thus, setting aside the myriad reasons for the finding that even that conclusion is flawed, the Study does not establish that the respondents thought that the commercial as a whole compared the Reflex Action to any other razor. The court therefore finds that the Razor Commercial Study does not establish the meaning consumers attribute to the term "blades" as used in the Reflex Action commercials.

The Jacoby Study likewise fails to establish the meaning that Gillette argues should be accorded "blades" as used in the commercials. Dr. Jacoby, however, did ask some questions that Gillette asserts are relevant to this inquiry. As noted above, the Jacoby Study asked respondents whether the commercial compared the Reflex Action to another product. Seventy-seven percent of the respondents

---

**19.** To support its contention that only the commercial target audience is relevant, Gillette cites the following cases: *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134; *Rhone–Poulenc,* 19 F.3d 125; *Smithkline Beecham,* 960 F.2d 294; *Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990). None of these cases, however, states that the target audience is limited in the way that Gillette asks the court to limit it here. Gillette asserts that the universe should be limited specifically to the audience described as the "target" in Norelco's strategy documents. The only case, however, that really discusses a "target audience" does so in the context of advertising mailed exclusively to physicians, who made up the entire consuming public for purposes of that advertising. *See Sandoz,* 902 F.2d at 229–30. In the instant case, the commercials were broadcast nationwide. The *Sandoz* court did not mention "target audience" at all when discussing advertising broadcast to the general public. *Id.* at 229.

answered that the commercial made a comparison to blade razors. Only those respondents then were asked to what brand, if any, the commercial was comparing the Reflex Action. The results of this question, however, do not support Gillette's contention that the Reflex Action is compared, in the commercials, to Sensor or SensorExcel and to all blade razors. Twenty-eight percent of the respondents said that they did not know to which blade the Reflex Action was being compared, and eighteen percent said that the comparison was to no specific brand of razor. Thus, sixty-nine percent of all respondents (including the 23% who saw no comparison to blade razors) did not see any comparison, did not know to what brand the Reflex Action was being compared, or did not think that the Reflex Action was being compared to a specific brand of blade razor.

Although nineteen percent of the Jacoby Study respondents answered that the Reflex Action was being compared to a Gillette product, this result, in the court's view, is insufficient to show that consumers view the commercial as making a comparison to the Sensor or SensorExcel. In the first place, four of the thirty respondents who identified Gillette stated that the comparison was to other brands of razors as well. Thus, the percentage of respondents who thought that the comparison was specifically and exclusively to a Gillette product is actually about sixteen percent rather than nineteen percent. Even if the nineteen percent, or sixteen percent, were enough to support the conclusion that the commercial compared the Reflex Action to some Gillette product (a question as to which the court makes no finding, however), the Jacoby Study did not go further to determine to what specific Gillette product the Reflex Action was being compared. The respondents in the Jacoby Study merely answered "Gillette," when asked to name a brand of wet razor to which the Reflex Action was being compared; they did not indicate to what specific Gillette wet razor was being compared or whether they thought the comparison was to all Gillette wet razors. Thus, even if the court accepted the Jacoby Study as demonstrating that consumers understand the commercial to compare the Reflex Action to a Gillette product, the court still would be without consumer survey responses sufficient to assess whether consumers understand the commercials to compare the Reflex Action to the Sensor or SensorExcel.

Nor does the Jacoby Study in any way demonstrate that the commercials compare the Reflex Action to all blade razors. The fact that Dr. Jacoby presumed, as he testified, that this was the meaning of the commercials is not relevant. He did not design his survey to determine whether the commercials were perceived by consumers to compare the Reflex Action to all blade razors, and his survey did not elicit responses showing that result.

Finally, the probative value of the Jacoby Study is diminished, as was that of the Razor Commercial Study, because its universe was incomplete. The Jacoby Study respondents were limited to male wet shavers over age eighteen. Thus, it excluded women who might purchase the Reflex Action as a gift, males under age eighteen, and users of electric razor, all of whom are potential purchasers of the Reflex Action. Again, Gillette asserts that the target audience of the commercials is the relevant test universe. The court has discussed above the reasons for discounting a study based on the target audience of the commercials, rather than upon a universe (as Dr. Jacoby describes it) "of past and/or prospective purchasers of the product ..." Jacob Jacoby, et al at 572. It does appear that the Jacoby Study, unlike the Razor Commercial Study, actually employed Norelco's target audience (using as it did only respondents who were male wet shavers). The reliance of the Study on a target audience, as distinguished from the universe of actual or potential purchasers, however, undermines the usefulness of the Study.

## B. Meaning of "Irritation"

The meaning that consumers take away from the commercials also requires proof of what meaning consumers attach to the term "irritation" as used in the commercials. As this case evolved, that issue reduced itself to whether consumers believe "irritation" to encompass the phenomenon of nicks and cuts;[20] the parties are agreed that consumers understand the term to include conditions such as redness, burning, and bumps.

Much of the evidence offered at trial dealt with how the parties had defined the term irritation in the past and whether their respective definitions had included "nicks and cuts." Whether Gillette viewed nicks and cuts as a subset of irritation in the past and whether Norelco treated nicks and cuts in the past as a phenomenon separate from irritation are questions that are largely beside the point.[21] Here the question is what consumers understand irritation to mean as used in the commercials. Thus while the Gallerani Affirmation, the Adolescent Shaving Study, the Callé Report, the Male Wet Shaving Survey On Post–Shave Irritation, the 1989 GRI Study, the 1990 GRI Study, and the other papers discussed earlier in this memorandum all bear on the positions taken by the parties in the past, these materials do not demonstrate how consumers view the term "irritation" as used in the commercials at issue. Therefore, to the extent that these several studies and other evidence are addressed to previously held views as to whether nicks and cuts are

manifestations of irritation, the evidence is unenlightening.

Gillette did offer more current consumer research directed to the meaning of irritation. That research is reflected in a study conducted by Dr. Dupont. Dr. Dupont's study set out to determine how consumers describe shaving irritation. Like much of the other evidence of the meaning of irritation, however, the Dupont Study does not answer the essential question of what consumers understand the commercials at issue to mean by "irritation."

In a telephone survey, Dr. Dupont and his colleagues asked respondents, who said that they suffered from irritation from shaving with blades, to describe that irritation. Those respondents who said that they did not suffer irritation or that they did not know whether they suffered irritation then were asked if they ever received nicks and cuts from blade shaving.

The respondents were not shown the television commercials, however. The context in which the term "irritation" was used in the commercials is critical to an understanding of what consumers think the commercials mean. The commercials all featured a variety of visuals that well might affect how consumers interpret the term "irritation." Indeed, because the visuals differed from one commercial to the next, consumers may very well have interpreted the term "irritation" differently for each commercial. For example, consumers might well interpret the Fire Breathing Razor commercial to depict razor burn

---

**20.** The consumer survey studies submitted on the issue of whether the Reflex Action produces less irritation than blades favor Norelco if nicks and cuts are included as a component of irritation.

**21.** Although the positions the parties have taken in the past regarding whether consumers include nicks and cuts in their understanding of irritation is largely irrelevant for present substantive purposes, it is no insignificant matter that Gillette changed its position on that question *in this very case.* Mr. Gallerani affirmed, under oath at the preliminary injunction stage of the case, that nicks and

cuts were one of the "indicia of irritation." At trial, Gillette renounced that position and urged its opposite. That revision of Gillette's position was delivered matter-of-factly and as if that had been Gillette's position all along by, among others, Drs. Slife and Cohen, both of whom had reviewed Mr. Gallerani's affirmation before it was filed, but had suggested no change in his statements regarding nicks and cuts. Thus, in addition to everything else that contributes to the failure of Gillette's proof of what consumers understand irritation to mean, Gillette's position on the question lacks even the credibility of consistency.

as an aspect of irritation; on the other hand, consumers might well interpret the commercial featuring the corroded, "possessed" razor to depict some other form of irritation.

Dr. Dupont himself admitted that the context of a commercial can affect what viewers think a word used in that commercial means. As he testified: "If my only purpose is to find out what irritation means in the context of a specific ad, then the proper way to do it would be to show that ad and ask the questions." Thus, it appears that the Dupont Study was never intended to test for consumer understanding of the meaning of irritation as used in the commercials at issue.

Furthermore, both Dr. Dupont and another Gillette expert, Sharon Keith, agreed that the visual aspects of commercials can affect what consumers view to be the meaning of those commercials. Therefore, because the Dupont Study asked about irritation in the abstract, and not against the backdrop of the commercials themselves, the court finds that the Dupont Study is not probative on the subject of what consumers interpret the commercials to mean by "irritation."

The Dupont Study is not probative for another reason. Because only 8.4% of respondents who experienced irritation included nicks and cuts in their description of that irritation, and because 43.1% of the respondents who said that they did not experience irritation stated that they did experience nicks and cuts when asked directly, Dr. Dupont concluded that "consumers regard 'irritation' and 'nicks and cuts' as separate concepts." That conclusion, however, does not withstand scrutiny. Those respondents who stated that they did experience irritation were only asked an open-ended question: to describe that irritation. Those respondents who answered that they did not experience irritation or that they did not know were only asked the closed-ended question, whether they received nicks and cuts from blade-shaving. These latter respondents, however, were not asked the same closed-ended question about the other conditions that both parties apparently acknowledge are reflections of irritation. We do not know therefore whether respondents denying the experience of irritation would have answered "yes" to a closed-ended question about redness or bumps, for example. Moreover, it is conceivable that if the respondents who reported shaving irritation had been asked closed-ended questions about specific shaving conditions, rather than merely the open-ended descriptive question, many more of them might have reported specific conditions such as nicks and cuts and redness than did under the actual study design.

These difficulties with Dr. Dupont's inference were demonstrated vividly at trial. Dr. Dupont was shown previous Gillette surveys in which respondents who reported shave irritation first were asked to describe it and then were asked whether they experienced specific conditions, including redness, bumps, and nicking. In those surveys, when asked direct questions about specific conditions, some respondents who originally had stated that they did not suffer from irritation, did report nicking, redness, and bumps. Additionally, of those respondents who had reported irritation, much greater numbers reported redness, bumps, burning, and nicking when asked specifically about those conditions as compared to when they were merely asked to describe their shaving irritation. Dr. Dupont stated at trial that from these survey results he would have to conclude that the majority of respondents did not view redness, bumps, and burning as part of shaving irritation. · But that conclusion is at odds with the view held by both parties that redness, bumps, and burning are viewed by consumers to be forms of irritation. Dr. Dupont's views therefore lead to the curious result that the commercials cannot be tested for their tendency to mislead even as to those conditions that the parties agree truly reflect consumer understanding of irritation.

The Jacoby Study appears to have some bearing on the question of whether consumers interpret the term "irritation," as used at least in the "Fire Breathing Razor" commercial, to encompass nicks and cuts. Gillette, however, has not pointed to this Study as relevant to the discernment of consumer understanding of irritation as used in the questioned commercials. Because the Jacoby Study is part of the record in this case, however, the court has considered it in the context of the irritation issue. The Jacoby Study did not specifically ask respondents what they thought the term "irritation" meant in the context of the Fire Breathing Razor commercial or whether they thought that the term included nicks and cuts. On the other hand, the Study did elicit responses to open-ended questions that can be fairly interpreted to mean that consumers view the "Fire Breathing Razor" commercial as referring to burning when it speaks of irritation.

In response to the open-ended question, "Other than trying to sell you a product, what was the main idea of this ad," 26% of respondents said that the Reflex Action would not "burn/feel (like fire)," while the razor with a blade would; and another 3% said that the Reflex Action would not "burn as much/feel (like fire)," while the razor with a blade would. Of those respondents who were asked what the commercial said or "suggest[ed] about how your face would feel during or after shaving with a razor with a blade," 35% responded that the Reflex Action would not "burn/feel (like fire)," while the razor with a blade would "burn/feel (like fire) your face/skin;" and 1% stated that the Reflex Action would not "burn as much/feel (like fire)," while the razor with a blade would "burn/feel more (like fire) your face/skin." Finally, when asked, "When the ad shows a flame coming out from between the blades, what do you think this picture means or suggests," 53% percent of the respondents said that the Reflex Action would not "burn/feel (like fire)," while the razor with a blade would "burn/feel (like fire) your face/skin;" and 1% stated that the Reflex Action would not "burn as much/feel (like fire)," while the razor with a blade would "burn/feel more (like fire) your face/skin." These results show that the survey respondents viewed the "Fire Breathing Razor" commercial to represent the burning sensation as a manifestation of irritation.

Although the Jacoby Study respondents cited conditions other than burning, including nicks and cuts, those other conditions did not come close to approximating the percentages relating to the burning sensation.[22] As noted above, the Jacoby Study did not specifically ask consumers what they thought the commercial meant by "irritation" or whether they thought that that term, as used in the commercial, encompassed nicks and cuts. Additionally, as mentioned earlier, the Jacoby Study would have been more reliable as a whole had it included a larger universe of potential Reflex Action purchasers. One can say at least, however, that the Study shows that target audience views irritation, as used in the Fire Breathing Razor commercial, to include the burning sensation.

**22.** In response to the "main idea" question, 5% of the respondents mentioned "cut/scratch/scrape/ nick/tear/rip." In response to the second question about how one's face would feel, 4% mentioned "cut/scratch/scrape/nick/tear/rip." In response to the third question, directed specifically at the visual images, 2% mentioned "cut/scratch/scrape/nick/tear/rip."

As explained previously, Dr. Jacoby also tested the meaning of the tag line, "Anything Closer Could Be Too Close For Comfort." The largest percentage of respondents (33%) thought that the tag line meant, "If you get closer it will tear/cut your skin," suggesting that consumers may think that "irritation" as used in the "Fire Breathing Razor" commercial encompasses nicks and cuts as well as burning. Because these answers were given in response to a question directed at only one aspect of the commercial, however, they are less meaningful on the issue of what consumers take away from the commercial as a whole. Furthermore, the element of the commercial to which the respondents were directed in this question did not explicitly refer to "irritation" at all.

The terms "blades and irritation" are key concepts in all of Norelco's commercials. Knowing how consumers understand these concepts, as they are used in the commercials, is an essential first step in determining whether the commercials are misleading. Gillette has not taken that step. It therefore has not established the meaning consumers extract from the commercials. Blocked at the threshold by a failure to demonstrate what the commercials mean to consumers, Gillette cannot advance to the falsity-determination stage of its Lanham Act claim. No injunctive relief is warranted because Gillette has not prevailed on the merits.

### C. Attorneys' Fees

■ Norelco has requested that the court award it attorneys' fees. The Lanham Act provides for the award of attorneys' fees to a prevailing party in a patent, trademark, or unfair competition action "in exceptional cases." 15 U.S.C. § 1117(a). The party requesting attorneys' fees must prove the exceptional circumstances by clear and convincing evidence. See Seven–Up Co. v. Coca–Cola Co., 86 F.3d 1379, 1390 (5th Cir.1996); Olsonite Corp. v. Bemis Mfg. Co., 610 F.Supp. 1011, 1026 (E.D.Wis.1985). The decision whether to award attorneys' fees is within the district court's discretion. See BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir.1994); Seven–Up, 86 F.3d at 1390; Dorr–Oliver Inc. v. Fluid Quip, Inc., 966 F.Supp. 718, 720 (N.D.Ill.), aff'd, 132 F.3d 36 (7th Cir.1997).

■ The court finds that this case is not "exceptional" for purposes of attorneys' fees. The court finds true Norelco's claim that representatives of Gillette, even before they had seen the commercials at issue, corresponded with executives of national television networks in an effort to prevent the showing of the commercials. The court also finds true Norelco's claim that Gillette had done no consumer testing of consumer perceptions of the commercials before Gillette contacted the television network executives and before Gillette brought suit in this case. In addition, the court acknowledges a certain surprise and even vexation (or irritation, if you will) with Gillette's flip-flop on the nicks and cuts question during the pendency of the case— a flip-flop that apparently began, without notice to the court, even as the court was considering its ruling on the preliminary injunction and had assumed Gillette's belief in the Gallerani Affirmation.

Notwithstanding these concerns, the court is not inclined to shift Norelco's fees to Gillette. To be sure, Gillette was, to put it gently, over-eager in its correspondence to the television network executives and in bringing this action before it had tested consumer reaction to the commercials. Although that conduct deserves some rebuke— here given— the court is persuaded that Gillette corresponded with the networks and brought this action in the sincere belief (albeit without empirical support for that belief) that its Sensor and SensorExcel were superior overall to the Reflex Action, and that Norelco could not prove otherwise. As for the change of position on nicks and cuts, the court believes that the reproof Gillette received from the court on this matter at trial and in this memorandum is enough.

Moreover, the fact is that Gillette has achieved some successes in this case. Although Gillette has not prevailed on the merits of its claims as to the commercials discussed in this memorandum, Gillette did have success in an earlier phase of this case. Gillette persuaded the court, at the preliminary injunction phase, that it was likely to succeed in showing that Norelco's advertising, based on Norelco's Celebrity Study, was misleading. See Gillette I, 946 F.Supp. at 137–38. The court accordingly granted preliminary injunctive relief, prohibiting the use of advertising that makes claims based on the Celebrity Study. See id. at 141. Norelco did not pursue the issue of the Celebrity Study at trial. Gillette also persuaded the court at the preliminary injunction stage that it would likely succeed at trial in establishing as

misleading any claim that Norelco made in its advertising that the Reflex Action is less irritating than blades "starting from day one." *Id.* at 140–41. The court thus enjoined Norelco from making that claim and required Norelco to include in its advertisement a statement to the effect that a shaver should not expect less irritation until the shaver uses the Reflex Action for at least twenty-one days. *See id.* Norelco complied and did not pursue at trial the matter of this revision to its advertisement for the Reflex Action. As to these two matters, then, one might argue that Gillette is the prevailing party (although the court need not make such a finding and does not do so).

Because the court does not find that Gillette was motivated in bad faith to scuttle the commercials at issue and because Gillette has achieved some successes in this case, the court does not find this case exceptional. Accordingly, Norelco's request for attorneys' fees is denied.

### VII. Summary

Gillette has failed to succeed on the merits of its Lanham Act claim. It has not established how consumers interpret the commercials, and therefore, the court is unable to determine whether the commercials, as understood by consumers, are false or misleading for purposes of section 43(a) of the Lanham Act. Accordingly, judgment on the merits shall enter for Norelco. Norelco's request for attorneys' fees, however, is denied.

So ordered.